94 N.J. Super. 196 (1967)
227 A.2d 523
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
RICHARD A. COPELAND, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 27, 1967.
Decided March 13, 1967.
*197 Before Judges CONFORD, FOLEY and LEONARD.
Mr. Luke T. Nitti argued the cause for appellant.
Mr. James R. Zazzali, Assistant Prosecutor, argued the cause for respondent (Mr. Brendan T. Byrne, Essex County Prosecutor, attorney).
The opinion of the court was delivered by FOLEY, J.A.D.
Defendant Copeland and one Pinson were convicted by a jury upon an indictment charging entering a building of Thomas Gordon with intent to steal. Only Copeland appeals.
Gordon operated a luncheonette in the building which is located on the corner of Academy and Wickliffe Streets, *198 Newark, and designated as 246 Academy Street. Copeland lived a half-block away at 268 Academy Street; Pinson lived less than a mile away.
On March 10, 1964 Gordon closed and locked his store at 11:15 P.M., his usual closing hour. He left the lights on. He went home, and then returned to the store about a half-hour later, intending to remain overnight. When he arrived he saw two men in the store. The taller of the two, identified by him as Copeland, was standing "behind the counter by the cash register." The shorter of the two, whom he identified as Pinson and as a person previously known by him, was standing at the entrance door of the store. Gordon yelled: "What are you doing in there?" He then went to the back of the building. The two men, joined by a third, ran from the back door and jumped over a rear yard fence.
Gordon then ran back to Academy Street, turned the corner of Wickliffe Street and ran to West Market Street, which is a block away. At that point the three men appeared upon the scene. One, unidentified, went west on West Market Street. Copeland and Pinson turned into Wickliffe or Wilsey Street and entered a poolroom. As they passed him Gordon said, "I recognize you as being in my place." There was no reply.
Gordon then telephoned the police who responded in a patrol car. Gordon entered the car and shortly thereafter Copeland and Pinson came from a nearby tavern, where they were arrested by the police officers, after Gordon identified them as the men who had been in his store.
Gordon returned to the store and found that nothing had been taken, but observed that the double door at the rear of the premises had been "broken all to pieces, to splinters."
Pinson testified that he and Copeland were at Pinson's home until about 11:30 P.M., when they left to go to Copeland's home. They stopped there briefly and then went to the poolroom, and almost immediately thereafter to the tavern. He denied that they had been in the store. Copeland did not testify.
*199 Defendant's argument on this appeal may be divided into two separate and unrelated points. Defendant first contends that the court erred in charging as follows:
"* * * Now, there is evidence that the defendants on trial fled from the scene. If you believe the testimony beyond a reasonable doubt that a defendant, fearing an accusation would be made against him for the crime here charged, took refuge in flight for the purpose of evading that accusation, then you may consider that flight in connection with all the other evidence and testimony relating to that particular defendant. The flight of a defendant, members of the jury, after the commission of a crime, if unexplained is evidence from which the jury is at liberty to draw some inference of a consciousness of guilt." (Emphasis added)
It is well settled that an unexplained flight from the scene of the crime is a circumstance tending to prove consciousness of guilt. State v. Petrolia, 45 N.J. Super. 230, 233-234 (App. Div. 1957); State v. Centalonza, 18 N.J. Super. 154, 161 (App. Div. 1952). The nub of defendant's argument is that the words "if unexplained" called upon defendant to testify in explanation of the flight, and that since he had elected not to testify, the allusion in the charge impaired his constitutional rights contrary to State v. Lanzo, 44 N.J. 560 (1965). In that case our Supreme Court, following Griffin v. State of California, 380 U.S. 609 (1965), forbade either comment by the prosecutor on the accused's silence or instructions by the court that such silence is evidence of guilt. We find Lanzo factually inapposite.
In the first place, the court at the conclusion of its charge and upon the request of defendant's attorney stated:
"Members of the jury: You are aware, I am sure, that the defendant Richard A. Copeland did not take the stand and testify in this case. I charge you that he is under no duty, no obligation, to take the stand and testify in his own behalf, and you cannot draw any adverse inference against him for his failure to take the stand."
The attorney expressed his satisfaction with the foregoing instruction.
*200 Secondly, if propriety of the use of the words "if unexplained" may be regarded as debatable, they give the benefit to a defendant who offers no evidence, of having the jury take into consideration all of the evidence in the case in determining whether the apparent flight was explainable as being prompted by a legitimate motive rather than a consciousness of guilt. Reading the charge as a whole we find no error.
Defendant's second point is that the court erred in permitting the State on the cross-examination of defendant's witness Catherine Carson, Pinson's mother, to develop the fact that Pinson had asked her while defendants were at her home for 50 cents to buy a package of cigarettes. Defendant's argument is based upon the holding in State v. Mathis, 47 N.J. 455, 471-472 (1966), that a defendant's lack of money may not be shown because the practical result of such evidence, tending to establish a probability of a defendant's desire to commit a crime, would be to put a poor person under unfair suspicion and at relative disadvantage.
While in theory the principle of Mathis might appear to apply here, analysis of the facts in the two cases leads to different results when viewed in terms of the prejudice suffered by the respective defendants. In Mathis the prosecutor cross-examined defendant as to how much money he had and when he last worked. The examination suggested strongly that the State might be urging that defendant was in financial need, and hence was likely to commit a robbery. The State argued that the evidence was proper as affecting defendant's credibility with respect to his assertion that he had been assisting his father in the repair of automobiles at his father's home, this having bearing upon a factual issue in the case which we need not pause to detail. It may be readily seen from the Mathis opinion that defendant's lack of money, when emphasized by the cross-examination in the jury's presence, might well have impressed the jury as being a probable motive for the commission of the crime there involved. Incidentally, we note that in the presence of the jury the court also mentioned financial need and the purpose for which it might be shown. *201 While the judge clearly indicated that such proof would not be admitted to show a likelihood that defendant committed robbery, the question of financial need was highlighted before the jury to an extent not present in this case, as we shall hereinafter point out.
The facts in this case, as they relate to the admission of the challenged evidence and the prosecutor's comment thereon, are as follows: Mrs. Carson, when called as a witness for her son Pinson, testified briefly that he, accompanied by Copeland, was at her apartment on March 10, 1964 at 11 P.M. and stayed until after 11:30 P.M. During that time she served him some food. On cross-examination it was developed that she and her son and Copeland discussed a crime movie. Then:
"Q. And just before that Paul asked you for fifty cents to get some cigarettes?
MR. SILVERMAN: I object, your Honor.
A. Yes.
THE COURT: I will permit it.
Q. He asked you for some money to get some cigarettes.
A. Yes.
MR. McGLYNN: That is all I have. Thank you.
MR. SILVERMAN: That is all."
It is noted that the naked objection stated by defendant's attorney did not include a statement of the grounds therefor, as required by R.R. 3:7-8. On the other hand, it is likewise noted that it is not an uncommon (and certainly preferable) practice for a court to ask of the attorney the basis of the objection, particularly where, as here, the answer comes in before the court rules. It should, however, be pointed out at this juncture that no colloquy between court and the respective attorneys took place which would have tended to expose to the jury the idea that Pinson's lack of money was in some way an inducing cause for the commission of the crime.
Nothing further was said about Pinson's request for 50 cents until the summations. At that time defendant's attorney argued that defendants "by a fortuitous set of circumstances *202 happened to be in the area where a crime allegedly  and I use the word allegedly  took place." In replying, the prosecutor, seizing upon the defense attorney's use of the word "fortuitous," said:
"Well, you heard Mr. Gordon testify. Did he make a mistake? What was the basis for his identification of these two boys? The birthmark on the man that he had seen in his store and the way the other fellow combed his hair.
Here they are. Was Mr. Gordon lying to you? Was he mistaken or was he not telling you the truth? Fortuitous circumstances that the boys happened to be in the neighborhood? Well, was it fortuitous that the one boy, whose mother testified, had to borrow fifty cents for cigarettes? Was that fortuitous? Was it fortuitous that they had been sitting around discussing a program on television that dealt with crime, with criminal activity? Was that fortuitous? Was it fortuitous the two boys were seen by Mr. Gordon in his store?"
These remarks were not objected to by defendant's attorney nor were they made the basis of a motion for mistrial even though the attorney asked for and received additional instructions from the court on the subject of Copeland's failure to testify. This course of action runs contrary to R.R. 3:7-7 (b).
We are satisfied that the philosophy of State v. Mathis, supra, makes it plain that where evidence of impecuniosity of a defendant may tend to prove motive or willingness to commit a crime such as is here involved, it should not be admitted and, as naturally follows, it should not be commented upon. However, in light of the facts and the procedural questions before us, we are firmly convinced that the allusion by the prosecutor to Pinson's inferable impecuniosity, in the frame of reference above outlined, was not an influential factor leading to conviction in this case.
As we have pointed out, defendant, admittedly, accompanied by Pinson, was in the vicinity of the crime at the time it was committed. There was positive identification of both men by Gordon as those who perpetrated the crime. There was uncontradicted evidence that the crime had been committed. In these circumstances we find no rational basis *203 for disturbing the jury's determination, particularly because to do so we would have to assume that the jury concluded that defendants committed the crime for lack of money, even though at no point in the trial did anyone suggest either expressly or by necessary implication that such a view was tenable. In short, we find no prejudicial error under R.R. 1:5-1(a).
Affirmed.
CONFORD, S.J.A.D. (dissenting).
I feel reversal is called for here under State v. Mathis, 47 N.J. 455 (1966). In that case a conviction for murder in the course of robbery was reversed for the sole reason that the State had developed the fact of defendant's lack of a job for the purpose, as the court thought (at p. 471), of indicating defendant's destitution as a motive for the crime. Although the court had previously indicated (at p. 465) that "the evidence [was] ample" to show defendant was the killer, it nevertheless held as both "improper and injurious" to the point of necessitating reversal (at p. 472) the State's projection before the jury of "the forbidden theme that defendant had no apparent means of income and hence was likely to commit a crime for dollar gain." Ibid.
The exclusionary rule in question should not be applied reluctantly, growing, as it does, out of the law's concern that the poor not be subjected to added disadvantage in criminal prosecutions by mere reason of their poverty. State v. Mathis, supra (at p. 472).
It is true that in the present case the improper evidence related directly to the non-appealing defendant Pinson and only indirectly to defendant Copeland. However, the evidence by its nature and in light of the admitted close association of these boys during the entire evening in question must have had the same potentiality for harm with respect to Copeland as for Pinson.
The majority is satisfied that the references to Pinson's poverty were "not an influential factor leading to conviction *204 in this case." Whether or not they were cannot of course be known as a certainty, but it is clear to me that they had a distinct capacity for prejudice  as the Supreme Court held similar evidence did in the Mathis case. And it is even clearer that the prosecutor desired the jury to be influenced by the evidence  witness his allusion in summation to the fact that "one boy * * * had to borrow fifty cents for cigarettes * * *." (emphasis added.) What does this communicate to the jury other than that these boys were so lacking in funds that it is probably true that they tried to rob the luncheonette?
On the whole case, I think defendant's objection to the improper proof should be deemed adequate to raise the point. The failure to object to the second allusion, that in summation, is not controlling. An objection would just have emphasized to the jury the concededly relevant (although incompetent) effect of the subject matter even if the court then ruled it improper.
This was a relatively short trial. The State's references in cross-examination and summation to the impecuniosity of one of the defendants were likely to stand out in the jurors' minds when deciding the basic issue of credibility between Gordon and Pinson as to the defendants' involvement.
In assaying the State's assertion of absence of prejudice on the whole record, moreover, one cannot ignore the possible contributive effect of the additional improper allusion in the State's summation to the fact that the defendants had been watching a crime program on television prior to going out that evening, as inferably indicative of guilt. The potential cumulative influence of this factor, in the setting of the prejudicial capacity of the other, is not mitigated by the failure of assigned counsel to raise it at trial or on appeal.
A retrial confined to competent proofs and summation would best serve the ends of justice.