**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0536-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

LUIS ALMONTE,

     Defendant-Appellant.

_____

Submitted February 1, 2021 – Decided July 27, 2021

Before Judges Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 16-07-0112.

Joseph E. Krakora, Public Defender, attorney for appellant (David J. Reich, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Daniel Finkelstein, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Following a jury trial, defendant and co-defendant Jorge Oviedo-Difo, who was tried in absentia, were convicted of second-degree possession of a handgun without a permit, N.J.S.A. 2C:39-5(b) (count one); and two counts of fourth-degree possession of prohibited weapons and devices, N.J.S.A. 2C:39-3(f)(1) and 2C:39-3(j) (counts two and three, respectively). Defendant was sentenced to an aggregate term of five years' imprisonment with a forty-two-month period of parole ineligibility.

The convictions stemmed from a multi-state sting operation conducted by the Drug Enforcement Administration (DEA) to identify members of a Philadelphia crew that perpetrated home invasions to rob drug dealers. The physical items forming the evidential bases for the charges were recovered during a consent search of the co-defendant's vehicle conducted at a rest stop on the New Jersey Turnpike when the co-defendant and defendant were en route to a fabricated home invasion in New York that had been arranged by a confidential informant (CI) working for the DEA.

Defendant now appeals from his convictions raising the following points for our consideration:

POINT I[1]

---

1 We condensed Point I for clarity.

THE TRIAL COURT ABDICATED ITS LEGAL OBLIGATION TO ACT AS A GATEKEEPER WITH RESPECT TO THE INTRODUCTION OF EVIDENCE OF OTHER BAD ACTS.

    A.    The Trial Court Failed To Find Clear And Convincing Evidence Other Bad Acts Were Committed.

    B.    The Trial Court Failed To Submit Required Jury Instructions Concerning The Other Bad Acts Evidence.

    C.    The Trial Court Failed To Sanitize The Other Bad Acts Evidence.

    D.    The Court Allowed The Jury To Hear Substantial Amounts Of Other Patently Inadmissible Testimony.

POINT II

THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN DENYING [DEFENDANT'S] MOTION TO SEVER AND THEN PERMITTING HIS ABSENT CO-DEFENDANT'S POST-ARREST STATEMENT TO BE USED TO INCULPATE HIM.

POINT III

A NEW TRIAL IS WARRANTED IN VIEW OF THE PREJUDICE CAUSED BY THE PROSECUTOR'S MISCONDUCT.

POINT IV

3

A NEW TRIAL IS WARRANTED IN VIEW OF THE CUMULATIVE ERRORS IN THIS CASE (NOT RAISED BELOW).

After considering the arguments presented in light of the record and applicable law, we affirm.

I.

Following significant motion practice, trial commenced on June 14, 2018. We glean these facts from the record of the four-day trial, during which the State produced three witnesses, DEA Agent Steven Chapman, the CI, and New Jersey State Police Detective Joseph Czech. Agent Chapman testified that during a sting operation conducted in late 2015 to early 2016, the DEA obtained a phone number and a code word to contact a suspected crew operating out of Philadelphia that robbed drug dealers. Because the identity of the crew members was unknown, the DEA gave the phone number to a paid CI to identify the members and infiltrate the crew.

On December 29, 2015, at the behest of the DEA, the CI contacted an individual identified as co-defendant Oviedo-Difo at the phone number acquired during the investigation. Once the CI confirmed that co-defendant Oviedo-Difo was interested in participating in a robbery, the CI arranged a meeting in New York to discuss a fabricated robbery of a stash house in the Bronx. The phone

4

A-0536-18

conversation between the CI and co-defendant Oviedo-Difo to arrange the meeting was recorded. According to Chapman, the DEA planned to arrest the crew members when they arrived to rob the stash house.

The CI testified that co-defendant Oviedo-Difo and an individual later identified as defendant attended the prearranged meeting in Manhattan. During the meeting, the CI informed defendants he had a contact inside an apartment containing money and drugs, and that the contact would give them access to the apartment for the robbery. The CI told defendants he would call them the day before the planned robbery and asked them how they would commit the robbery. According to the CI, co-defendant Oviedo-Difo responded that they would bring "tape and a ski mask." When the CI specifically asked if they were "coming with guns," both defendants responded "[o]f course" as they anticipated that the apartment occupant would be armed. The CI suggested that defendants "wear a hat and a hoodie" to conceal their identities.

The New York meeting took place in an SUV parked at a prearranged location, lasted approximately twenty minutes, and was secretly recorded by the CI, who was seated in the back seat next to defendant and had an unobstructed view of defendant. Co-defendant Oviedo-Difo sat in the driver's seat and an unidentified male sat in the front passenger seat. The audio recording of the

A-0536-18

meeting was played for the jury during the trial and a transcript was provided as an aid.

A few weeks after the meeting, the CI called co-defendant Oviedo-Difo and told him that everything was set for the following day. On the day of the planned robbery, January 20, 2016, co-defendant Oviedo-Difo told the CI in a phone conversation that they were "getting ready to leave." Throughout the day, Oviedo-Difo and the CI continued to communicate via telephone and the conversations were recorded.

Defendants traveled from Philadelphia in co-defendant Oviedo-Difo's vehicle to meet the CI for the robbery in New York. However, while en route, the car began to overheat, and, at about 4:00 p.m., Oviedo-Difo told the CI that he had to pull off at a rest stop on the New Jersey Turnpike. At the request of the DEA, members of the New Jersey State Police responded to the Grover Cleveland Rest Area and arrested defendants when they observed them approach the disabled vehicle described to the officers by the DEA. Although the vehicle was not surveilled when it left Philadelphia, the DEA was aware of its location through the telephonic communications between the CI and co-defendant Oviedo-Difo.

A-0536-18

After obtaining consent from co-defendant Oviedo-Difo, the registered owner of the vehicle, Detective Czech testified that he and other unit members searched the vehicle, beginning at 6:35 p.m. The search uncovered a semi-automatic Smith and Wesson handgun[2] loaded with a large capacity magazine and hollow-point bullets hidden inside a sock secreted behind the radio in the "dashboard center console compartment" of the vehicle. Neither defendant had a permit for the gun. Suspected robbery tools consisting of two black ski masks, black gloves, duct tape, zip ties, and a black hooded sweatshirt were found on the backseat. In the rear portion of the vehicle, officers recovered a bag of suspected burglary tools consisting of screwdrivers, pliers, socket wrenches, and the like.

After being administered his Miranda[3] warnings, co-defendant Oviedo-Difo gave a statement to police. Detective Czech testified that, in the statement, Oviedo-Difo explained that he was giving defendant a ride from Philadelphia to New York to meet someone in the music industry when "[his] truck broke

---

[2] Subsequent testing confirmed that the gun was operable.

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

down." Oviedo-Difo admitted that other than the hooded sweatshirt,[4] the gloves, and the ski masks,[5] the items found in the back seat and the rear of the vehicle belonged to him. When questioned by police, he provided innocuous and inconsistent explanations for the presence of the items in the vehicle. Oviedo-Difo also stated he installed an after-market radio in the compartment where the gun was found but denied any knowledge or ownership of the gun.

Defendant testified on his own behalf. He emphatically denied being present at the New York meeting, denied that it was his voice on the audio recording of the meeting, and denied any knowledge of a planned robbery. He stated that co-defendant Oviedo-Difo was "an acquaintance" he met "[a]t the barbershop" in Philadelphia. Defendant explained that the only reason he was in Oviedo-Difo's vehicle when they were arrested was because he needed a ride to New York for a business meeting with a client in the music industry and defendant's car was unreliable. Defendant stated he had "an entertainment company" that "manage[d] artists and musical events." Defendant claimed he did not know there was a gun in the car and did not notice the items in the rear

---

[4] Oviedo-Difo was wearing a black hooded sweatshirt when he was arrested.

[5] Oviedo-Difo described the ski masks as hats that were needed for the frigid New York temperature.

A-0536-18

of the car when he placed his "jacket"[6] there.  Defendant expressly denied ownership of the ski masks.  After he was convicted and sentenced, this appeal followed.

## II.

## A.

In Point I, defendant argues that "[i]n view of the absence of an express finding of clear and convincing evidence that [defendant's] voice was on the recording or that he ever met or spoke with the informant," as required under Rule 404(b),[7] it was reversible error for the trial judge "to submit the audio recording and the transcript of that recording to the jury" when defendant "vehement[ly] dispute[d]" the account.  Defendant asserts further that the judge erred in failing "to instruct the jury concerning the limited purposes for which the other bad acts at issue could be considered" and erred in failing "to sanitize

---

[6]  The jacket referred to the hooded sweatshirt recovered from the back seat of the vehicle.

[7]  Under State v. Cofield, 127 N.J. 328, 338 (1992), the Court adopted a four-prong test to screen for admissibility of other crime evidence under Rule 404(b), requiring that the evidence be "relevant to a material issue;" "similar in kind and reasonably close in time to the offense charged;" "clear and convincing;" and have "probative value" that is "not . . . outweighed by its apparent prejudice." (citations omitted).

the other bad acts evidence" to redact discussions about the details of the planned robbery to "minimize its harmful impact." Defendant also contends he was deprived of "a fair trial" by repeated "testimony linking [him] to the alleged planned robbery" elicited from the CI and Agent Chapman, which evidence "had no probative significance concerning the weapons possession charge[,] . . . was patently inadmissible under other well established evidence rules," and "embellished and distorted the facts." The State counters that "[e]vidence of the robbery was intrinsic" to the charged crimes and therefore admissible. We agree.[8]

"[E]vidence that is intrinsic to the charged crime is exempt from the strictures of Rule 404(b) even if it constitutes evidence of uncharged misconduct that would normally fall under Rule 404(b) because it is not evidence of other

---

[8] Defendant asserts that because the judge admitted the evidence in question under Rule 404(b) on the State's application, the State is now precluded from arguing an alternate theory on appeal. However, the general rule promulgated in Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973), that "appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available" does not apply "where an issue was raised in the trial court even if argument before the trial court was based on a different theory from that advanced in the appellate court." Pressler & Verniero, Current N.J. Court Rules, cmt. 3 on R. 2:6-2 (2020). Moreover, because an appeal is taken from the court's ruling rather than reasons for the ruling, we may rely on grounds other than those upon which the trial court relied. See State v. Williams, 444 N.J. Super. 603, 617 (App. Div. 2016).

crimes, wrongs, or acts." State v. Rose, 206 N.J. 141, 177 (2011) (citation and quotation marks omitted).

> Thus, evidence that is intrinsic to a charged crime need only satisfy the evidence rules relating to relevancy, most importantly the Rule 403 balancing test. Thus, characterization of evidence as "intrinsic" significantly affects the calculus because the principle animating Rule 403 is that relevant evidence is admissible unless its probative value is substantially outweighed by a negative feature of the evidence, whereas Rule 404(b) operates from the premise that evidence of other bad acts is inadmissible unless proffered for a proper purpose. It is therefore more likely that evidence of uncharged misconduct will be admitted into evidence if it is considered intrinsic to the charged crime and subject only to Rule 403 than if it is not considered intrinsic evidence and subject to both Rule 404(b) and Rule 403.
>
> [Id. at 177-78.]

Accord State v. Santamaria, 236 N.J. 390, 410 (2019) ("[I]f evidence is found to be intrinsic to the crime at issue, it does not constitute other-acts evidence and is subject only to the limits of Rule 403.").

To determine if evidence is "intrinsic," our Supreme Court adopted the test articulated in United States v. Green, 617 F.3d 233 (3d Cir. 2010), which limits intrinsic evidence to "two narrow categories of evidence." Rose, 206 N.J. at 180.

A-0536-18

First, evidence is intrinsic if it "directly proves" the charged offense. This gives effect to Rule 404(b)'s applicability only to evidence of "other crimes, wrongs, or acts." If uncharged misconduct directly proves the charged offense, it is not evidence of some "other" crime. Second, "uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime."

[Id. at 180 (quoting Green, 617 F.3d at 248-49).]

"[T]he Court predicted that its holding would have little impact upon evidentiary rulings" and would not exclude "evidence that is currently admissible as background or 'completes the story' evidence under the inextricably intertwined test" encompassed in the doctrine of intrinsic evidence. State v. Brockington, 439 N.J. Super. 311, 327 (App. Div. 2015) (quoting Rose, 206 N.J. at 180).

Here, proof of the planned robbery was intrinsic to proving certain statutory elements of the possessory crimes charged. To prove defendant possessed the loaded handgun found secreted in co-defendant Oviedo-Difo's vehicle, the State had to prove defendant knew the gun was in the car. See State v. Brown, 80 N.J. 587, 600 (1979) (explaining that proof of "knowledge and control" are "essential elements of constructive possession"). Thus, proof of the planned robbery provided essential background that was admissible as intrinsic evidence under the inextricably intertwined test. "Such evidence, even though

12

inconclusive as to all the elements of the charged offenses, is admissible because it has probative value as to one or more of the statutory elements the State must establish beyond a reasonable doubt." Brockington, 439 N.J. Super. at 328.

Accordingly, the evidence was subject only to a Rule 403 analysis, and not a Rule 404(b) analysis as defendant contends. See State v. Skinner, 218 N.J. 496, 517 n.5 (2014) (observing that "details that . . . dovetail with the facts of the case" constitute direct proof of the charged offense, which "should be analyzed for relevance under [Rule] 401 and evaluated under [Rule] 403's standard for prejudice, and not the standard for prejudice under a Cofield analysis" (citing Rose, 206 N.J. at 177-78)). Because the evidence here is clearly relevant to material facts at issue in the determination of defendant's guilt of the charged offenses, "the question is whether the evidence should be excluded because 'its probative value is substantially outweighed by the risk of . . . undue prejudice.'" Brockington, 439 N.J. Super. at 333 (quoting Rule 403).

"The mere possibility that evidence could be prejudicial does not justify its exclusion." State v. Long, 173 N.J. 138, 164 (2002) (quoting State v. Morton, 155 N.J. 383, 453-54 (1998)). "Even when evidence is 'highly damaging' to a defendant's case, 'this cannot by itself be a reason to exclude otherwise admissible and probative evidence.'" Brockington, 439 N.J. Super. at 333

13

(quoting State v. Frost, 242 N.J. Super. 601, 620-21 (App. Div. 1990)). "Evidence claimed to be unduly prejudicial is excluded only when its 'probative value is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation' of the issues in the case." Long, 173 N.J. at 163-64 (quoting State v. Koskovich, 168 N.J. 448, 486 (2001)).

Here, neither the CI's testimony detailing the New York planning meeting nor the CI's identification of defendant as a participant at the meeting was so inherently inflammatory as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the issues in the case. Instead, the testimony was essential to the jury's fair evaluation of the issues in dispute. The jury was free to accept the testimony as proof of defendant's knowledge of the planned robbery and attendant possession of the gun needed to commit the crime or reject it as inadequate particularly in light of defendant's denials. We therefore conclude that the probative value of the evidence was not outweighed, let alone, significantly outweighed, by undue prejudice and sanitization was not required. We also reject defendant's argument and reach the same conclusion with respect to the testimony of Agent Chapman concerning the DEA's plan to arrest defendants when they arrived to commit the robbery, which plan was

14

thwarted by co-defendant Oviedo-Difo's vehicle breaking down before they arrived.

As a participant in the New York planning meeting, with personal knowledge of what transpired, the CI provided the necessary foundation for the admission of the audio recording and transcript. See N.J.R.E. 602 (permitting a witness to testify to a matter about which "the witness has personal knowledge"); see also N.J.R.E. 901 ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must present evidence sufficient to support a finding that the item is what its proponent claims."). "The proponent of the evidence is only required to make a prima facie showing of authenticity." State v. Mays, 321 N.J. Super. 619, 628 (App. Div. 1999). "Once a prima facie showing is made, . . . the ultimate question of authenticity of the evidence is left to the jury." Ibid.

Moreover, as a participant in the conversation, the CI was permitted to opine on the meaning of the discussions. See N.J.R.E. 701 (permitting "the witness' testimony in the form of opinions or inferences" when it "is rationally based on the witness' perception" and "will assist in understanding the witness' testimony"). Further, hearsay statements the CI attributed to defendants were admissible as statements offered against a party. See N.J.R.E. 803(b)(5)

(exempting from exclusion as hearsay a statement "offered against a party-opponent" that was "made at the time the party-opponent and the declarant were participating in a plan to commit a crime . . . and the statement was made in furtherance of that plan"); see also Mays, 321 N.J. Super. at 629 ("Since the telephone call was properly authenticated, the content of the conversation, albeit hearsay, was admissible as a statement offered against a party, the defendant." (citing N.J.R.E. 803(b))). Because we are satisfied that the evidence was admissible as intrinsic evidence and complied with all evidentiary requirements, it was "exempt from the strictures of Rule 404(b)" and did not require a limiting instruction. Rose, 206 N.J. at 177.

### B.

In Point II, defendant argues the judge erred in denying his pre-trial motion to sever his trial from co-defendant Oviedo-Difo, who "had absconded from the country" and "was not expected to return." Defendant continues that "[e]ven if one were to overlook this error, there was no justification for the court allowing the use of Oviedo-Difo's post-arrest statement to inculpate [defendant]."

> Two or more defendants may be charged and tried jointly "if they are alleged to have participated in the same act or transaction" constituting the offense. Indeed, under those circumstances, a joint trial is

16

"preferable" because it serves judicial economy, avoids inconsistent verdicts, and allows for a "more accurate assessment of relative culpability."

[State v. Weaver, 219 N.J. 131, 148 (2014) (quoting State v. Brown, 118 N.J. 595, 605 (1990)); see R. 3:7-1 (indictment); R. 3:15-1 (trial).]

However, "[i]f, for any reason, it appears that a defendant . . . is prejudiced by the joint trial, the trial court may sever." Id. at 148-49 (citing R. 3:15-2(b)). "The decision to sever is within the trial court's discretion, and it will be reversed only if it constitutes an abuse of discretion." Id. at 149. "[I]n deciding whether to grant a severance the trial court must balance the possible prejudice to the defendant against the government's interest in judicial economy and must consider the ways in which it can lessen the prejudice by other means. . . ." State v. Morant, 241 N.J. Super. 121, 134 (App. Div. 1990) (quoting State v. Barrett, 220 N.J. Super. 308, 311 (Law Div. 1987)). "[I]f by proper instructions and charges to the jury the separate status of codefendants can be maintained, the 'danger by association' which inheres in all joint trials is effectively overcome." Ibid.

Here, defendant argues the joint trial unduly prejudiced his right to a fair trial because of co-defendant Oviedo-Difo's absence from the trial and the State's use of Oviedo-Difo's "statement to [defendant's] detriment." Without

17

question, severance is appropriate where a joint trial would deprive a defendant of his right to a fair trial. State v. Sanchez, 143 N.J. 273, 282 (1996). However, in State v. Melendez, 129 N.J. 48, 50 (1992), the Court held that the trial court did not abuse its discretion in denying the motion for severance where the co-defendant "failed to return to court the day after the State had rested its case." Likewise, here, we discern no abuse of discretion in the judge's denial of severance based on co-defendant Oviedo-Difo's absence from the trial.

The use of co-defendant Oviedo-Difo's statement against defendant during the trial is more problematic. "We recognize that the United States Supreme Court permits use of a co-defendant's statement that does not directly incriminate another defendant as long as all references to the defendant are removed." Weaver, 219 N.J. at 159 (citing Richardson v. Marsh, 481 U.S. 200, 211 n.5 (1987)). Further, in State v. Broxton, 49 N.J. 373, 377 (1967), the Court found no error in trying defendants jointly where "nothing in any confession . . . on its face or because of some collateral circumstance identified any other defendant as one of the culprits." See also State v. Mayberry, 52 N.J. 413, 421 (1968) (finding severance was not warranted where only basis for severance motion was that some evidence would be admissible only as to one co-defendant).

Here, it is undisputed that co-defendant Oviedo-Difo's statement made references to defendant. However, those references did not incriminate defendant but exculpated him. Indeed, during summations, defense counsel stated "frankly, Oviedo[-]Difo exculpates my client, exonerates him with respect to any guns." Notably, co-defendant Oviedo-Difo admitted that other than the jacket, ski masks, and gloves, the items found in the rear of the vehicle were his possessions. The fact that Oviedo-Difo gave conflicting accounts of why he had certain items in the car neither implicated nor incriminated defendant. Significantly, by confirming that he was giving defendant a ride to New York for a business meeting, Oviedo-Difo's statement was consistent with and corroborated defendant's testimony. For that reason, while it was error to use Oviedo-Difo's statement at the joint trial without eliminating all references to defendant, the error was harmless. See State v. Haskell, 100 N.J. 469, 479 (1985) ("From time to time, cases may arise where the admission of a co-defendant's statement in a joint trial constitutes harmless error."); State v. Carter, 54 N.J. 436, 442-46 (1969) (finding that error, if any, was harmless in allowing testimony of oral non-inculpatory statement of defendants at their joint trial).

In Point III, defendant argues that "the various instances of prosecutorial misconduct which occurred in th[e] case" individually and cumulatively "deprived [him] of his constitutional right to a fair trial." Specifically, defendant asserts that comments made by the prosecutor in opening and closing statements as well as during cross-examination of defendant require reversal of his convictions.

"[P]rosecutorial misconduct can be a ground for reversal where the prosecutor's misconduct was so egregious that it deprived the defendant of a fair trial." State v. Frost, 158 N.J. 76, 83 (1999). "In determining whether a prosecutor's misconduct was sufficiently egregious, an appellate court 'must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred.'" Ibid. (quoting State v. Marshall, 123 N.J. 1, 153 (1991)). "Specifically, an appellate court must consider (1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." Ibid.

"Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." Ibid. "The failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made." Id. at 84. "The failure to object also deprives the court of an opportunity to take curative action." Ibid. Because defense counsel did not object to many instances now claimed on appeal to constitute prosecutorial misconduct, "defendant must demonstrate plain error to prevail." State v. Timmendequas, 161 N.J. 515, 576 (1999). "Plain error is 'error possessing a clear capacity to bring about an unjust result and which substantially prejudiced the defendant's fundamental right to have the jury fairly evaluate the merits of his defense.'" Id. at 576-77 (quoting State v. Irving, 114 N.J. 427, 444 (1989)).

First, defendant argues the prosecutor "provided the jury with inaccurate facts about [defendant] . . . during . . . opening statement" by telling "the jury they would hear from Agent Chapman that [defendant] was a known burglary ring suspect in a pending criminal investigation." During opening statement, the prosecutor said, "Agent Chapman will tell you that he was investigating a burglary ring of which [co-defendant Oviedo-Difo] and [defendant] were suspected of being members." At trial, Agent Chapman testified that when they began the investigation, they did not know the identity of the crew members.

21

However, as a result of the investigation, the identities of the crew members were ascertained. Because defendant did not object, we review the remark under the plain error standard of review. See R. 2:10-2 ("[T]the appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial . . . court.").

"A prosecutor's opening statement 'should provide an outline or roadmap of the State's case' . . . ." State v. Land, 435 N.J. Super. 249, 269 (App. Div. 2014) (quoting State v. Walden, 370 N.J. Super. 549, 558 (App. Div. 2004)). "A prosecutor in [his or] her opening statement may state only those facts that [he or] she intends to prove in good faith. [He or s]he also may argue all inferences that properly may be drawn from those facts." Timmendequas, 161 N.J. at 577. "As all damaging evidence is inherently prejudicial, the court affords the prosecutor considerable leeway in making [his or] her opening." Ibid. "However, the court must patrol the boundaries of propriety to ensure that defendant's right to a fair trial is not compromised." Ibid.

Applying these principles, we conclude that the statement was a fair comment on the evidence actually produced at trial. Moreover, because the judge clearly advised the jury that "opening statement[s were] not evidence," and "[w]e presume that the jury followed the court's specific admonitions

regarding the role of opening statements," id. at 578, we find no plain error and no evidence that the prosecutor's statement substantially prejudiced defendant's right to a fair trial.

Next, defendant argues that in summations, the prosecutor "improperly vouch[ed] for his own witness" by telling the jury that the CI was "a reliable witness." Defendant further asserts the prosecutor made improper "[r]eferences to the absence" of "a motive [to lie]" by asking the jury "[w]hat reason would [the CI] have to lie" and by telling the jury that "if [the CI] told a lie he could be prosecuted" and "would have jeopardized the stream of payment he received as a paid informant." Additionally, defendant asserts the prosecutor "overstepped his bounds in maligning [defendant]" by telling the jury that defendant was "lying . . . because he doesn't want you to convict him." Once again, defendant failed to object to any of these comments.

"Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." Frost, 158 N.J. at 82. "In other words, as long as the prosecutor 'stays within the evidence and the legitimate inferences therefrom,' [t]here is no error." State v. McNeil-Thomas, 238 N.J. 256, 275 (2019) (alteration in original) (first quoting State v. R.B., 183 N.J. 308, 330 (2005); and then quoting

State v. Carter, 91 N.J. 86, 125 (1982)).  However, certain comments that deviate from these well-established principles are not permissible.

In that regard, while prosecutors are typically barred from arguing that a witness had no motive to lie, see R.B., 183 N.J. at 331-32, it is well-settled that the State "may argue that a witness is credible, so long as the prosecutor does not personally vouch for the witness or refer to matters outside the record as support for the witness's credibility."  Walden, 370 N.J. Super. at 560.  Further, "[w]hile a prosecutor has the right to call to the jury's attention discrepancies in a defendant's testimony and then argue that the defendant was not truthful, a prosecutor cannot express a personal opinion regarding the credibility of a defendant's testimony. . . ."  State v. Jenkins, 299 N.J. Super. 61, 70 (App. Div. 1997).  Additionally, "[i]t is well settled that when a defendant takes the witness stand in a criminal case, he puts his character in issue and it is proper for the State . . . to call attention to his interest in the result."  State v. Sinclair, 57 N.J. 56, 65 (1970).

Our task is "to consider the 'fair import' of the State's summation in its entirety."  State v. Jackson, 211 N.J. 394, 409 (2012) (quoting State v. Wakefield, 190 N.J. 397, 457 (2007)).  When reviewing a prosecutor's summation, we consider "the context in which the challenged portions were

made, including determining whether the remarks were a measured response to defendant's summation made in an attempt to 'right the scale.'" State v. Murray, 338 N.J. Super. 80, 88 (App. Div. 2001) (quoting State v. Engel, 249 N.J. Super. 336, 379 (App. Div. 1991)).

Here, we are satisfied there was no misconduct "so egregious that it deprived the defendant of a fair trial." Jackson, 211 N.J. at 409 (quoting Frost, 158 N.J. at 83). During the trial, defense counsel attempted to undermine the credibility of the CI by extensively cross-examining both Agent Chapman and the CI about the CI's criminal record, the fact that the CI avoided imprisonment by working for the DEA as an informant, the large payments the CI received while working for the DEA, the monetary incentive for the CI to dupe targets to enhance his payments, and the role and responsibilities of an informant. During summations, defense counsel continued this line of defense by assiduously attacking the credibility of the CI, pointing out to the jury that he was "a felon" who was "paid very generously" by the DEA and who "lie[d] so much that [he] didn't] know the truth from a lie anymore." Counsel stated that although "[the prosecutor] may think his witnesses were truthful," in fact, the CI whose "word [was] the [government's] key evidence" was not "truthful."

A-0536-18

We view the challenged comments regarding the CI's credibility and reliability as "a measured response to defendant's summation." Murray, 338 N.J. Super. at 88 (citation omitted). Indeed, the prosecutor responded during summation that the CI had a monetary incentive not to lie. "A prosecutor is not forced to idly sit as a defense attorney attacks the credibility of the State's witnesses; a response is permitted." State v. Hawk, 327 N.J. Super. 276, 284 (App. Div. 2000). See State v. Johnson, 287 N.J. Super. 247, 266 (App. Div. 1996) ("A prosecutor may respond to an issue or argument raised by defense counsel.").

Regarding the prosecutor's comment that defendant was lying because he did not want to be convicted, immediately preceding those remarks, the prosecutor stated:

> So, when you're evaluating the testimony of the witnesses who testified in this case, think about who's got a reason to lie to you. [The CI] has every reason in the world to tell you the truth because if he lies once this great source of income dries up for him. [Defendant], on the other hand, doesn't want to be convicted of the crimes with which he's charged. He doesn't want to acknowledge that he was with [co-defendant Oviedo-Difo]. He doesn't want to acknowledge that they planned this crime together. He doesn't want to acknowledge that he knew this gun was there. If he admits that[,] you're going to convict him. He has every motive in the world to lie and his

testimony just in one short morning was wildly inconsistent from one question to the next.

Because the prosecutor did not express a personal opinion regarding defendant's credibility but relied on evidence presented during the trial and the legitimate inferences therefrom, the comments were permissible "within the context of the trial as a whole." McNeil-Thomas, 238 N.J. at 276 (quoting State v. Feaster, 156 N.J. 1, 64 (1998)). Moreover, "[t]he failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made," Frost, 158 N.J. at 84, and the judge clearly advised the jury that "summations" were "not evidence and should not be treated as evidence."

Next, defendant argues that "[t]he prosecutor's cross-examination regarding [defendant's] prior employment and non-payment of income taxes was likewise improper." According to defendant, "[t]he overall message the prosecutor sought to convey in pursuing this line of attack was to highlight [defendant's] lack of business income" to "suggest that [defendant's] financial status gave him an incentive to rob." Defendant asserts the "impropriety" was

A-0536-18

"compounded" by the "prosecutor's unsolicited remark," "That's a nice watch," to "insinuate[e defendant] was a criminal because of the watch he wore."[9]

"[I]t is generally improper to use a defendant's poverty to establish a criminal motive." State v. Stewart, 162 N.J. Super. 96, 100 (App. Div. 1978).

> Undoubtedly a lack of money is logically connected with a crime involving financial gain. The trouble is that it would prove too much against too many. As said in 2 Wigmore, Evidence (3d ed. 1940), § 392, p. 341:
>
> > "The lack of money by A might be relevant enough to show the probability of A's desiring to commit a crime in order to obtain money. But the practical result of such a doctrine would be to put a poor person under so much unfair suspicion and at such a relative disadvantage that for reasons of fairness this argument has seldom been countenanced as evidence of the graver crimes, particularly of violence."
>
> [State v. Mathis, 47 N.J. 455, 471-72 (1966).]

Here, during direct examination, defendant testified the only reason he was in co-defendant Oviedo-Difo's vehicle was because Oviedo-Difo was giving

---

[9] The State acknowledges that the "watch" comment "was not ideal." However, the judge sustained defense counsel's objection, explaining "[s]omeone could have a nice watch because it's a gift." We agree that the comment was objectionable, but it was fleeting and isolated. "[A] 'fleeting and isolated' remark is not grounds for reversal." State v. Gorthy, 226 N.J. 516, 540 (2016) (quoting State v. Watson, 224 N.J. Super. 354, 362 (App. Div. 1988)).

 A-0536-18

him a ride to New York for a business meeting "with a new artist." Defendant testified that he had a production company with "a music studio" and an "office" located in Philadelphia and that he made trips to New York "[o]nce or twice a week." According to defendant, his clients were "new artists that have dreams." He stated that operating the company was his full-time job and he had been in the music business for "[a]round [twelve] to [fifteen] years."

On cross-examination, the prosecutor inquired whether defendant filed a tax return for his company to which defendant responded that he did not because "the company [was] not generating any income." When the prosecutor asked whether defendant was "breaking the law" by not filing a tax return for the company, defense counsel objected. The judge sustained the objection and instructed the jury to "disregard th[e] comment." In response to the prosecutor's additional questions about the company, defendant testified that he started the company in 2016 but the company had not made any money to date. He stated that prior to starting the company, he worked for a trucking company "for about eight or ten years" but did not recall whether he ever filed a tax return in connection with that job.

We are convinced that the prosecutor's questions about defendant's employment history and non-payment of taxes were not intended to elicit

evidence of impecuniosity on the part of defendant to prove motive or willingness to commit a crime but to impugn defendant's credibility by undermining his claim that he was traveling to New York for a business meeting rather than to commit the planned robbery. Defendant squarely put his employment at issue during his direct examination. The cross-examination was pertinent to challenge defendant's credibility as well as his substantive testimony about his claimed business. See Feaster, 184 N.J. at 248 (explaining "[o]ne of the essential purposes of cross-examination is to test the reliability of testimony given on direct-examination").

Contrary to defendant's suggestion, the cross-examination was not an impermissible collateral attack on defendant's credibility founded on an extraneous issue. See, e.g., State v. Scott, 229 N.J. 469, 495 (2017) (Albin, J., concurring) (explaining "a defendant, on trial for aggravated assault, cannot be asked whether he misstated his income on his tax returns" as a means of challenging credibility). In any event, the questioning "was not an influential factor leading to conviction in this case." State v. Copeland, 94 N.J. Super. 196, 202 (App. Div. 1967). To hold otherwise, "we would have to assume that the jury concluded that defendant[] committed the crime for lack of money, even though at no point in the trial did anyone suggest either expressly or by

necessary implication that such a view was tenable." Id. at 203. We therefore find no prejudicial error. See R. 2:10-2.

Equally unavailing is defendant's challenge to the prosecutor's cross-examination regarding defendant undergoing throat surgery one week after defense counsel received the audio recording of the New York meeting with the CI. Defendant ardently testified on direct examination that he did not attend the New York meeting and that it was not his voice on the audio recording. In response to the prosecutor's questions on cross-examination, defendant admitted having "an operation for a cyst . . . in [his] throat" but did not "remember when [he] had th[e] operation" or "when th[e] recording was given to [his] attorney." Defendant argues the questioning "violated the rules of permissible conduct" because "there was no evidence in the record regarding either of the two dates referred to by the prosecutor" and no "evidence that the operation changed [defendant's] voice" as "insinuated" by the prosecutor during summations.

Although a prosecutor is precluded from asking "questions about topics for which []he had no basis in truth," "[c]ross-examination relating to a witness's credibility need not be based on evidence adduced at trial." State v. Martini, 131 N.J. 176, 255 (1993). See State v. Rose, 112 N.J. 454, 500 (1988) (explaining that a question in cross-examination is improper where "no facts

31

concerning the event on which the question was based were in evidence and the prosecutor made no proffer indicating his ability to prove the occurrence"). Here, there was no objection to the line of questioning, leading us to conclude that the prosecutor had adequate grounds to question defendant about the throat surgery and its timing, and defense counsel did not deem the questioning prejudicial. In any event, in the absence of an objection, we are satisfied that whatever error may have occurred in permitting this line of cross-examination, it was not clearly capable of producing an unjust result. See R. 2:10-2.

### D.

Finally, in Point IV, defendant argues the cumulative errors "deprived [him] of his fundamental right to a fair trial." "We have recognized in the past that even when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal." State v. Jenewicz, 193 N.J. 440, 473 (2008). However, here, because we conclude there were no reversible errors either alone or combined, defendant's cumulative error argument must also fail.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0536-18