**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1038-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

KADER S. MUSTAFA,

    Defendant-Appellant.

_____

Argued December 18, 2024 – Decided January 27, 2025

Before Judges Mayer, Rose and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 18-07-0959.

Kevin S. Finckenauer, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Selletti, Public Defender, attorney; Kevin S. Finckenauer, of counsel and on the briefs).

Melinda A. Harrigan, Assistant Prosecutor, argued the cause for respondent (Raymond S. Santiago, Monmouth County Prosecutor, attorney; Melinda A. Harrigan, of counsel and on the briefs).

PER CURIAM

Defendant Kader S. Mustafa appeals from a June 7, 2022 judgment of conviction after a jury trial. Alternatively, he challenges the sentence imposed. We affirm the convictions for purposeful murder, possession of a weapon for an unlawful purpose, and endangering another person. However, we reverse the convictions on the two counts of second-degree possession of a handgun without a permit and remand for a new trial limited to those convictions.

We recite the facts from the trial testimony. In May 2018, defendant and his former girlfriend, Nicole Fiore, were living for about a year in defendant's white Chevrolet Impala. Throughout their five-year relationship, defendant espoused various conspiracy theories. For example, defendant told Fiore that forces were conspiring to harm or kill him and "people were shooting laser beams" and radiation rays at him. Further, defendant thought he was the subject of "gang stalking." Based on these beliefs, defendant frequently instructed Fiore to disassemble her cell phone and change her phone number so he could not be "tracked."

At trial, Fiore testified defendant abused prescription Adderall and used marijuana daily. Fiore struggled with her own addiction to prescription

painkillers. Defendant visited Fiore's physician to "manipulate" the doctor into issuing an Adderall prescription to him.

On May 3, 2018, Fiore testified she and defendant woke up after spending the night in a park and decided to travel to Asbury Park for the day. Fiore saw defendant take more than "three tablets" of Adderall that day, and testified he took "two at once."

That night, defendant and Fiore drove around in defendant's Impala. Fiore recounted defendant "yelling" about other drivers following him or "trying to hit him with radiation." At some point, defendant saw a Mazda Protegé in his rearview mirror with its high beams on. Defendant yelled at Fiore to "look at what they were doing," asserting the Mazda's driver was "high-beaming him." He told Fiore "see what I was talking about, . . . this is what's going on."

On May 3, 2018, Sciasia Calhoun borrowed her mother's Mazda to take her boyfriend and father of her child, Herve Michel, to his father's house in Asbury. While en route to Asbury, Michel suggested they return to Calhoun's house in Freehold.

Calhoun travelled on Route 33 to return home. The couple's infant daughter was in a car seat in the Mazda's rear passenger compartment. Calhoun

used the Mazda's high beams because the car's right headlamp did not function unless the high beams were activated.

After seeing the Mazda's high beams, defendant pulled his car to the side of Route 33, allowing Calhoun's car to pass. As soon as the Mazda passed, defendant sped toward it and flashed the Impala's high beams. Defendant closed the distance between his car and the Mazda, ramming the Mazda's rear bumper twice. To avoid being followed by the Impala, Calhoun exited Route 33.

At that moment, Fiore described defendant as "visibly . . . freaking out, . . . angry, breathing . . . heavy, [and] just really, really high anxiety." Defendant yelled "he couldn't take it anymore." At trial, Fiore testified :

> [She] saw [defendant] reaching down on the left side of his seat, with . . . what looked like, at the time, both hands. And he . . . reached down, and he pulled out . . . a gun, and he, at first, . . . put the gun in front of my face. And I started screaming at him. I said, what the fuck are you doing? What, are you going to try to shoot me? And he . . . literally switched hands and, . . . with his . . . elbow and his arm, he put his window down, and, . . . put the car in neutral, and the car . . . started slowing down. And I said, why are you slowing down? What are you doing, what are you doing? Like, do you want to get arrested? What the fuck is wrong with you? . . . And at this point, he's like, I'm sorry. I'm sorry. I just can't take it. I have to fight back. I'm not dealing with this anymore.
>
> And he . . . physically took himself out of the seat, and like, sat on the window sill, using his left hand, and he

4

A-1038-22

shot over the windshield. And he literally fired the gun.
And I remember seeing a spark.

And I turned around, and I looked, and I saw what, a
car like, kind of, what I thought was veering to the side
. . . .

At trial, Michel testified he heard a "boom" and ducked down inside the Mazda. Michel described Calhoun's head falling on his shoulder. He heard Calhoun "groaning" and saw blood "bubbling" from a wound in her head. When Michel's attempt to stop the bleeding failed, he called Calhoun's mother, his family, and 9-1-1.

Emergency Medical Services (EMS) responded to the 9-1-1 call and took Calhoun to a hospital. Calhoun died on the way from an "extensive brain injury."

On the night of May 3, 2018, a police officer from the Manalapan Police Department (MPD) patrolled Route 33. He saw the occupants of a white Impala appear startled as they drove past his patrol car. The officer planned to follow the Impala but was unable to make a U-turn safely. The officer checked the Impala's license plate number and learned the car was registered to defendant. Around the same time, the officer heard from police dispatch there was a shooting in Freehold involving a Chevy Malibu. A few minutes later, dispatch provided an update, stating the car involved in the shooting was an "older"

5

Impala. MPD officers searched Route 33 for the Impala, but were unable to locate it.

Officers from the Freehold Police Department (FPD) arrived at the shooting scene and rendered aid to Calhoun until EMS arrived. The FPD police officers also took a statement from Michel. In his statement to police, Michel stated a person in a white Impala shot at Calhoun.

Detectives from the Monmouth County Prosecutor's Office (MCPO) investigated the shooting. Based on the license plate information, MCPO detectives contacted defendant's brother, who lived in Freehold, and advised defendant could be found at a cousin's house in Manalapan.

Defendant's brother did not testify at trial. MCPO Detective Sergeant Kevin Condon testified that defendant's brother stated defendant "had psychological problems," and had "recently been to Monmouth Medical Center for treatment."

The MCPO detectives, accompanied by officers from the MPD, FPD, and and the New Jersey State Police, went to the cousin's house in Manalapan. They found a white Chevy Impala in the driveway parked behind a horse trailer. They discovered Fiore and defendant asleep inside the car. The officers instructed defendant and Fiore to put their hands in the air. Because defendant failed to

6

obey the officers' repeated commands, they broke the car window on the driver's side. When the officers pulled defendant from the car, they found a flare gun between his legs.

The police arrested and searched defendant. At the time of his arrest, defendant sported a baseball cap underneath a hard hat with a layer of aluminum foil between the two hats. Defendant also wore a silver "protective blanket" over his clothes. Lieutenant Scott Samis of the MCPO testified the blanket was similar to the type worn by runners after a marathon.

Fiore explained defendant wore Mylar to protect himself from radiation. However, defendant told Samis he wore the blanket "to lose weight." Despite defendant's statement to Samis, at trial, defense counsel asserted defendant wore Mylar to protect against radiation attacks.

The police found no weapons when searching defendant after his arrest. They towed defendant's Impala to an impound lot to be searched upon the issuance of a search warrant.

In searching defendant's wallet, MCPO detectives found a New Jersey Firearms Purchaser Identification Card (FPIC) issued to another individual. At trial, defense counsel and the prosecutor stipulated defendant lacked permits to carry or purchase a handgun.

A-1038-22

In searching defendant's Impala pursuant to a warrant, the police found: two handguns; boxes of ammunition; cartridges, including discharged cartridges; a speed loader; brass knuckles; a sheathed knife; a handgun case; a disassembled smart phone; a work shirt with an EMS patch; a bag of suspected marijuana; and a prescription bottle in defendant's name with fifty-three Adderall tablets remaining from a 120-tablet prescription.

After his arrest, defendant telephoned Fiore from jail. The State played the entire recorded conversation for the jury. During the exchange, defendant initially insisted someone else fired " a second shot," and that shot, not his shot, struck and killed Calhoun. Later in the conversation, defendant told Fiore the shooting "was an accident" and he only meant "to scare them." During his meandering jailhouse telephone call, defendant asked Fiore to marry him. Fiore declined, accusing him of "lying" and being unfaithful to her.

On July 30, 2018, a Monmouth County Grand Jury returned Indictment No. 18-07-0959, charging defendant with: first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) (count one); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count two); second-degree unlawful possession of a weapon without a permit, N.J.S.A. 2C:58-4 and :39-5(b) (counts

three and four); and third-degree endangering another person, N.J.S.A. 2C:24-7.1 (counts five and six).

The matter was tried before a jury between September 27 and October 12, 2021. The jury convicted defendant on all counts.

Defendant moved for a new trial, which the judge denied.

On May 5, 2022, the judge sentenced defendant as follows: on count one, life imprisonment subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2; on counts two and three, a prison term of ten years, with a five-year period of parole ineligibility imposed concurrently to count one; on count four, a prison term of ten years, with a five-year period of parole ineligibility imposed consecutively to counts one, two, and three; and on counts five and six, a flat prison term of four years imposed concurrently to count one. Additionally, the judge ordered payment of $24,886.57 in restitution.

On appeal, defendant raises the following arguments:

POINT I

> [DEFENDANT]'S CONVICTION FOR PURPOSEFUL MURDER MUST BE REVERSED BECAUSE THE JURY ALSO RENDERED UNANIMOUS VERDICTS ON EACH OF THE LESSER-INCLUDED OFFENSES OF MURDER. (Not Raised Below)

POINT II

THE JUDGE REVERSIBLY ERRED IN REFUSING TO INSTRUCT THE JURY ON DIMINISHED CAPACITY WHERE SUFFICIENT EVIDENCE IN THE RECORD EXISTED TO DEMONSTRATE THAT [DEFENDANT] SUFFERED FROM SIGNIFICANT MENTAL HEALTH PROBLEMS.

POINT III

[DEFENDANT]'S CONVICTIONS MUST BE REVERSED BECAUSE THE STATE PRESENTED A SUBSTANTIAL AMOUNT OF IRRELEVANT AND PREJUDICIAL EVIDENCE DESIGNED TO DENIGRATE [DEFENDANT] AND ADVANCED NUMEROUS IMPROPER ARGUMENTS SIMILARLY DESIGNED TO PORTRAY HIM AS A DISTURBED LONER.

A. The State Improperly Admitted into Evidence a Significant Number of Irrelevant but Highly Prejudicial Personal Items from [Defendant]'s Car to Paint Him as a Violent and Disturbed Person.

B. The State Advanced Improper Arguments That [Defendant] Committed the Shooting Because of His Adderall and Marijuana Use.

C. The State Elicited Irrelevant and Prejudicial Testimony About [Defendant]'s Life While Homeless and Made Denigrating Comments About His Homelessness and Poverty.

D. Much of the Jail Call Admitted by the State Was Irrelevant and Extremely Prejudicial.

A-1038-22

POINT IV

[DEFENDANT]'S SECOND-DEGREE FIREARM POSSESSION CONVICTIONS MUST BE REVERSED BECAUSE THE TRIAL COURT ERRONEOUSLY INSTRUCTED THE JURY ON THE ELEMENTS FOUND UNDER N.J.S.A. 2C:39-5(d), FOURTH-DEGREE UNLAWFUL POSSESSION OF A WEAPON (NON-FIREARM) INSTEAD OF THE ELEMENTS FOUND UNDER N.J.S.A. 2C:39-5(b), SECOND-DEGREE UNLAWFUL POSSESSION OF A FIREARM. (Not Raised Below)

POINT V

THE TRIAL COURT REVERSIBLY ERRED IN REFUSING TO ISSUE A LIMITING INSTRUCTION ON THE STATE'S MISLEADING DUI HYPOTHETICAL MADE WITH RESPECT TO MANSLAUGHTER DURING ITS SUMMATION.

POINT VI

SEVERAL ERRORS IN THE SENTENCING COURT'S ANALYSIS RESULTED IN THE ERRONEOUS IMPOSITION OF A SENTENCE THAT WAS THE FUNCTIONAL EQUIVALENT OF LIFE WITHOUT THE POSSIBILITY OF PAROLE.

A. The Trial Court Failed to Merge the Possession of a Weapon for an Unlawful Purpose Conviction with the Murder Conviction.

B. The Trial Court Erred In Refusing To Apply Mitigating Factor Four When It Was Uncontested That [Defendant] Suffered From Mental Health Issues That Contributed To The Commission Of The Offense.

11

C. The Trial Court Failed to Engage in the Required <u>Yarbough</u>/<u>Torres</u> Analysis Before Imposing Consecutive Sentences.

D. The Trial Court Imposed An Extraordinarily Significant Restitution Without Conducting An Ability To Pay Hearing.

I.

We begin with defendant's argument that his conviction for purposeful murder must be reversed because the jury violated the judge's instructions in rendering a verdict. Defendant contends the jury rendered an inconsistent verdict by finding him guilty of purposeful murder and the lesser-included offenses of aggravated manslaughter and reckless manslaughter.

Defendant acknowledged "trial counsel did not object" at the time the verdict was rendered. However, on appeal, defendant argues review and control of the verdict sheet rests with the trial judge under <u>Rule</u> 3:19-1, and the judge bore responsibility for ensuring the jury followed his instructions in returning a verdict. Additionally, defendant asserts the judge erred when polling the jury because two jurors replied "here" instead of "yes" when asked to confirm the verdict.

Defendant claims the jury verdict sheet attached to his counsel's motion for a new trial demonstrated the jury failed to follow the judge's instructions,

resulting in inconsistent verdicts. The verdict sheet attached to defendant's new trial motion checked the guilty box for murder as well as the guilty boxes for the lesser included offenses of aggravated and reckless manslaughter. However, defendant failed to produce any competent evidence that the verdict sheet included with defendant's new trial motion accurately reflected the document submitted to the judge after the jury rendered its verdict.

Prior to deliberations, the judge reviewed the verdict sheet with the jurors on the record. Question one on the verdict sheet asked the jurors whether they found defendant guilty of purposeful murder. In the event the jurors found defendant guilty of purposeful murder, question one(a) asked whether defendant "committed the [m]urder by his own conduct." The instructions on the verdict sheet directed the jurors answer questions two and three, aggravated and reckless manslaughter, only if the jurors found defendant not guilty in response to questions one and one(a).

Regarding completion of the verdict sheet, the judge instructed the jurors as follows:

> If you find that the State has failed to prove beyond a reasonable doubt that the crime of murder was committed, then you should consider whether the State has proven beyond a reasonable doubt that the defendant committed the lesser included offense of aggravated manslaughter.

13

> If you then find that the State has failed to prove beyond a reasonable doubt that the defendant committed the crime of aggravated manslaughter, then you must consider whether it was proven beyond a reasonable doubt that the defendant committed the lesser included offense of reckless manslaughter.

The judge repeated that if the jurors found defendant guilty of purposeful murder and "committed the murder by his own conduct," then they should "skip questions two and three and go directly to question four."

After deliberating for a little over an hour, the jury notified the judge that it reached a verdict. When the jurors returned to the courtroom, the judge, on the record, asked whether the jury agreed upon a unanimous verdict. The jury foreperson responded "yes."

The court clerk reviewed the verdict sheet with the jury foreperson. On count one, the foreperson stated the jury found defendant guilty of purposeful murder.

The judge then stated, "and following the instructions, you go to question [four]." The jury foreperson announced the jury's guilty responses to question four, defendant's possession of a weapon for an unlawful purpose on count two; question five, unlawful possession of a weapon on count three; and question six, unlawful possession of a semi-automatic handgun on count four. On counts five

14

and six, endangering the life of another person, the jury foreperson announced the jury's guilty responses on those counts.

Recognizing he forgot to "ask the Clerk to ask about question one (a)," the judge requested the clerk to "please read question one (a)" and "take the verdict." After the court clerk read question one(a), whether defendant committed the murder by his own conduct, the jury foreperson announced "yes." The judge then asked the foreperson to "hand up the verdict sheet."

After receiving the verdict sheet, the judge advised the court clerk would "poll the [twelve] deliberating jurors to confirm that . . . this is your verdict."

COURT CLERK: Okay, juror number 2?

JUROR: Yes.

COURT CLERK: Juror number 3.

JUROR: Yes.

COURT CLERK: Juror number 4.

JUROR: Yeah.

COURT CLERK: Juror number 5.

JUROR: Here.

COURT CLERK: Juror number 8.

JUROR: Here.

When the court clerk polled the remaining deliberating jurors, each responded "yes."

Thereafter, the judge thanked and discharged the jury. After the jurors left the courtroom, the judge asked the court clerk to mark the jury verdict sheet as court exhibit C-2. The judge then stated on the record "I have reviewed the verdict sheet. It is accurate as announced by the [f]oreperson. The verdict sheet has been marked C-2, as a court exhibit. I'll also indicate that the juror handed the court officer a note which read[], we have a unanimous verdict. Nothing else." The judge asked counsel if there was "anything further." Defense counsel and the prosecutor responded "no."

Based on our review of the record, we are satisfied the jury followed the judge's instructions in rendering a verdict and their verdict was consistent. In open court, the judge reviewed the verdict sheet and the jury's responses to the questions on the verdict sheet. After the jury found defendant guilty in response to questions one and one(a), the jury skipped questions two and three and proceeded to answer question four and the remaining questions on the verdict sheet. If the judge incorrectly recited the jury's verdict, the jury foreperson, or other members of the jury could have informed the judge. Moreover, if either trial counsel believed the jury failed to follow the judge's instructions in

16

answering the questions on the verdict sheet, the judge gave counsel an opportunity to address such concerns.

In rejecting defendant's argument, we note the certification from defendant's trial counsel filed in support of defendant's new trial motion did not assert the jury's verdict was inconsistent.[1] In support of the new trial motion, defense counsel pointed to: the judge's failure to issue a jury instruction on diminished capacity; the judge's decision to issue a flight instruction to the jury; the judge's allowing Sergeant Cattelona to testify as an expert witness; and newly discovered evidence post-trial.

The version of the verdict sheet in support of the new trial motion checked every guilty box, including the boxes for questions two and three. If trial counsel's version of the verdict sheet was inconsistent with the verdict sheet marked as court exhibit C-2, presumably he would have argued inconsistent

---

[1] Because defendant's trial counsel passed away, we are unable to ascertain why the verdict sheet annexed to his certification differed from the verdict sheet reviewed by the judge in court when accepting the jury's verdict. Defendant's appellate counsel inquired of the prosecutor, the clerk of the court, and deceased trial counsel's law firm whether they could locate a copy of the verdict sheet marked as court exhibit C-2. Appellate counsel received no response to his inquiries.

A-1038-22

verdicts as part of the new trial motion. No such argument was raised by defendant until this appeal.

Defendant offers speculation in support of his argument on this point. He asserts the verdict sheet attached to his trial counsel's certification with the new trial motion accurately reflected the jury's verdict. Defendant's trial counsel passed away and defendant is unable to explain why there are different versions of verdict sheet in his appellate appendix.[2]

However, based on the transcript of the jury's verdict, we are satisfied the jury followed the judge's oral and written instructions in completing the verdict sheet and did not render an inconsistent verdict. The jury found defendant guilty of murder in response to questions one and one(a). Following the judge's instructions, the jury skipped questions two and three, addressing the lesser

---

[2] Defendant's appellate appendix included a copy of a verdict sheet with a handwritten notation "judge's copy" and a copy of the verdict sheet purportedly filed by defendant's trial attorney in support of the new trial motion. On the copy of the verdict sheet marked "judge's copy," the jury answered questions one and one(a), skipped questions two and three, and answered the remaining questions consistent with the judge's instructions. However, the copy of the verdict sheet allegedly filed with defendant's new trial motion indicated the jury check every guilty box, including the guilty boxes in response to questions two and three.

included offenses of manslaughter, and answered the remaining questions on the verdict sheet.

The judge then confirmed the jury's verdict by directing the court clerk to poll the jury. All deliberating jurors responded when the court clerk inquired if the foreperson's pronouncement of the verdict was accurate.

We disagree with defendant that the deliberating jurors who answered "here" rather than "yes" rendered the polling process flawed. The purpose of jury polling is to discern any confusion or disagreement as to the precise statement of the verdict. See State v. Milton, 178 N.J. 421, 432 (2004) (citing R. 1:8-10). Determining whether a juror's answer to a jury poll reflects agreement with the verdict is left to the broad discretion of the trial judge. Id. at 433. We review such decisions for abuse of discretion, and determine only whether the decision was "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." State v. Chavies, 247 N.J. 245, 257 (2021) (quoting State v. R.Y., 242 N.J. 48, 65 (2020)). If a juror's answer is not directly responsive to the question asked, but leaves "no doubt as to the nature and intention of the response," then it is sufficient. Pressler & Verniero, Current N.J. Court Rules, cmt. on R. 1:8-10 (2025); see also Milton, 178 N.J. at 434.

Nothing in the responses by the jurors who stated "here" signaled disagreement or uncertainty regarding the unanimity of the guilty verdict. When polled, the jurors who responded "here" indicated no dispute with the verdict reported by the foreperson. On this record, we discern no abuse of discretion in the judge's determination that all deliberating jurors assented to the verdict.

## II.

We next consider defendant's argument the judge's failure to give a diminished capacity instruction to the jury deprived him of a fair trial. He also contends expert testimony was not required to assert a diminished capacity defense. We disagree.

Defendant claims there was sufficient lay testimony regarding his "delusions, erratic behavior, and hospitalizations," entitling him to a diminished capacity jury instruction. In support of his argument, defendant cites Detective Condon's hearsay testimony that defendant's brother stated defendant "suffered from mental health problems and had recently been hospitalized for psychological treatment," and Fiore's testimony providing "details of [defendant]'s paranoid-delusional behavior."

Defendant acknowledges he did not present testimony from "a doctor or admit psychological records" evidencing any mental health diagnosis.

20

However, defendant contends an ordinary person would understand someone who behaved as he did "suffered from some kind of mental health problem" without the need for expert testimony. Additionally, defendant argues "no case has ever held that expert testimony is required" for a diminished capacity instruction.

Initially, the judge included a diminished capacity charge when reviewing the proposed jury instructions with counsel during the charge conference. However, after receiving additional written and oral arguments regarding the diminished capacity charge, the judge explained he found no "cases where diminished capacity was an issue and the charge was given without there being some expert testimony . . . about a specific diagnosis." The judge stated, "there was no medical or expert testimony, [and] all of the cases that address when the diminished capacity charge is mandated, all have their genesis in expert testimony either by the defense or both by the State and the defense."

The judge acknowledged the trial evidence demonstrated defendant "exhibited bizarre behavior." However, he stated "there was no medical evidence, expert testimony or any evidence whatsoever indicating that the defendant suffered from a mental illness." In declining to give a diminished capacity instruction, the judge believed "to charge the mental disease or defect

21

would serve to confuse this jury," particularly because defendant withdrew his insanity defense prior to trial. Further, the judge explained "the murder charge itself sufficiently and correctly addresse[d] the state of mind and the reasonable doubt issues." In the absence of medical testimony or medical records, the judge concluded there was no need to give a separate diminished capacity instruction.

"Appellate courts apply a harmless error analysis when a defendant has objected to a jury charge." State v. Berry, 471 N.J. Super. 76, 105 (App. Div. 2022) (citing State v. Jenkins, 178 N.J. 347, 361 (2004)); see also R. 2:10-2. "Under that standard, there must be some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." Id. at 105-06 (alterations in original) (quoting State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Lazo, 209 N.J. 9, 26 (2012))). The reviewing court must first "determine whether the trial court erred." Jenkins, 178 N.J. at 361. If error occurred, "defendant's conviction cannot stand if the mistake 'was clearly capable of producing an unjust result such that a reasonable doubt is raised as to whether the error led the jury to a result it otherwise might not have reached.'" Ibid. (quoting State v. Brims, 168 N.J. 297, 306 (2001)).

22

To assert a diminished capacity defense, a defendant bears the initial burden of "present[ing] evidence of a mental disease or defect that interferes with cognitive ability sufficient to prevent or interfere with the formation of the requisite intent or mens rea[,]" and "evidence that the claimed deficiency did affect the defendant's cognitive capacity to form the mental state necessary for the commission of the crime." Baum, 224 N.J. at 160-61 (second alteration in original) (quoting State v. Galloway, 133 N.J. 631, 647 (1993)). Although a defendant must initially "introduce evidence of a mental disease or defect tending to show that he or she was incapable of forming the requisite intent, 'the statute does not shift the burden of proof to the defendant to disprove an essential element of the case.'" Id. at 161 (first quoting N.J.S.A. 2C:4-2, and then quoting State v. Moore, 122 N.J. 420, 431 (1991)). "[T]he burden of proof remains on the State to establish the mens rea of the offense." Ibid.

N.J.S.A. 2C:4-2 provides:

> Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense. In the absence of such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense.

A-1038-22

Expert testimony "concern[s] a subject matter that is beyond the ken of the average juror." Hayes v. Delamotte, 231 N.J. 373, 390 (2018) (quoting State v. Kelly, 97 N.J. 178, 208 (1984)); see also State v. Derry, 250, N.J. 611, 632-33 (2022). N.J.R.E. 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." "The necessity of expert testimony is determined by the sound exercise of discretion by the trial judge." Maison v. N.J. Transit Corp., 460 N.J. Super. 222, 232 (App. Div. 2019) (citing State v. Summers, 350 N.J. Super. 353, 364 (App. Div. 2002)).

A defendant is entitled to a jury instruction on diminished capacity "if the record shows that experts in the psychological field believe that [the defendant's] kind of mental deficiency can affect a person's cognitive faculties." Galloway, 133 N.J. at 647. "[W]hether 'a condition constitutes a mental disease or defect is one to be made in each case by the jury after the court has determined the evidence of the condition in question is relevant and sufficiently accepted within the psychiatric community to be found to be reliable for courtroom use.'" Baum, 224 N.J. at 161 (quoting Galloway, 133 N.J. at 643).

Here, it was undisputed the record contained evidence of defendant's strange behaviors. However, the evidence of defendant's odd behaviors came from defendant himself or lay persons familiar with defendant's peculiar proclivities, not medical expert testimony or medical records.

Defendant failed to proffer any evidence accepted within the psychiatric community of a mental disease or defect. Rather, defendant's trial counsel relied on defendant's behavioral quirks, such as wearing Mylar lined hats and clothing and perceiving he was stalked by gangs who wanted to harm or kill him with radiation. Defendant provided no expert testimony opining his odd behaviors impeded his ability to form the mens rea necessary to convict him of purposely shooting at Calhoun.

On the other hand, the State presented evidence that defendant knew what he was doing the night of May 3, 2018. At trial, the State played the recorded jailhouse telephone conversation between defendant and Fiore in which defendant admitted he intentionally fired his gun at the driver of the Mazda.

On this record, the judge did not abuse his discretion in declining to issue a diminished capacity instruction absent expert testimony. We are satisfied defendant needed to introduce expert testimony or medical documents sufficiently reliable and accepted within the psychiatric community to assist the

25

jury in determining whether he suffered from a mental disease or defect affecting his cognitive abilities. Evidence of bizarre or quirky behavior alone did not support the issuance of a diminished capacity jury instruction.

After appellate argument, defendant's counsel submitted a letter pursuant to Rule 2:6-11(d) citing State v. Arrington, __ N.J. Super. __ (App. Div. 2024), as additional support for his argument. We are satisfied the recent decision in Arrington, addressing the need for expert testimony in cases raising an insanity defense, does not support the issuance of a diminished capacity charge here.

Insanity and diminished capacity are separate defenses governed by different statutory provisions. N.J.S.A. 2C:4-1, governing an insanity defense, is an affirmative defense, which a defendant must prove by a preponderance of the evidence. State v. Gorthy, 226 N.J. 516, 533 (2016). N.J.S.A. 2C:4-2 is the diminished capacity statute. "Diminished capacity is a 'failure of proof' defense: evidence of defendant's mental illness or defect serves to negate the mens rea element of the crime." State v. Reyes, 140 N.J. 344, 354 (1995). In a diminished capacity case, the State has the burden of proof as to the defendant's mens rea as an element of the offense. The burdens of proof for these statutes clearly differ.

A-1038-22

In Arrington, the court held expert testimony from a qualified mental health professional was required to establish a defendant's "defect of reason, from disease of the mind" for an insanity defense. ___ N.J. Super. at ___ (slip op. at 2). The Arrington court expressly rejected the defendant's lay testimony regarding his "own allegedly insane mental state." Ibid. In that case, the court determined expert testimony was required to diagnose a "disease" in support of an insanity defense. Id. at 2-3. In reviewing the definition of "mental illness" and "disease," the Arrington court explained "laypersons generally are not qualified to make diagnoses of diseases, whether they be physical or mental." Id. at 16. The court noted whether a criminal defendant suffered from "'a defect of reason, from disease of the mind' . . . is a complex subject—one that necessitates expert testimony by a psychiatrist, a psychologist, or some other duly qualified mental health professional" and "entails 'scientific, technical, or other specialized knowledge'" consistent with N.J.R.E. 702. Id. at 18. We discern nothing in Arrington overruling Galloway and its progeny.

Contrary to defendant's argument, we read N.J.S.A. 2C:4-2 as requiring evidence of a mental disease or a mental defect bearing on the presence or absence of a defendant's cognitive ability to form the mental state necessary to purposefully kill someone. It is not self-evident that a particular mental

condition negates the mens rea of an offense as "many mentally disturbed persons are capable of acting purposely or knowingly." State v. Nataluk, 316 N.J. Super. 336, 344 (App. Div. 1998) (alteration in original) (quoting Reyes, 140 N.J. at 360). Applying the same reasoning as the Arrington court, expert testimony was required for defendant to establish he suffered from a mental disease or mental defect for diminished capacity instruction.

## III.

We next address defendant's argument for reversal of his convictions because the State presented irrelevant and prejudicial evidence and arguments designed to denigrate and portray him as a disturbed loner. Defendant cites to the following irrelevant and prejudicial evidence: his abuse or misuse of Adderall and marijuana which caused him to shoot Calhoun; his secretive behavior; his homelessness and poverty; his jailhouse call to Fiore; and certain personal items found in his car. We reject these arguments.

Prosecutors "are expected to make vigorous and forceful closing arguments to juries" and may make comments "reasonably related to the scope of the evidence presented." State v. Frost, 158 N.J. 76, 82 (1999) (citing State v. Harris, 141 N.J. 525, 559 (1995)). "Even so, in the prosecutor's effort to see that justice is done, the prosecutor 'should not make inaccurate legal or factual

assertions during a trial.'" State v. Bradshaw, 195 N.J. 493, 510 (2008) (quoting Frost, 158 N.J. at 85). Rather, "a prosecutor should 'confine [his or her] comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence.'" Ibid. (alteration in original) (quoting State v. Smith, 167 N.J. 158, 178 (2001)). "So long as the prosecutor's comments are based on the evidence in the case and the reasonable inferences from that evidence, the prosecutor's comments 'will afford no ground for reversal.'" Ibid. (quoting State v. Johnson, 31 N.J. 489, 510 (1960)).

We examine a prosecutor's comments "in the context of the entire trial." State v. Morton, 155 N.J. 383, 419 (1998). To reverse, the prosecutor's summation must have been "clearly and unmistakably improper" and "substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." State v. Wakefield, 190 N.J. 397, 438 (2007) (quoting Smith, 167 N.J. at 181-82).

In determining whether a prosecutor's conduct deprived defendant of a fair trial, we consider: "(1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." Smith, 167 N.J. at 182.

29

We review a trial judge's evidentiary rulings for abuse of discretion. State v. Nantambu, 221 N.J. 390, 402 (2015). A judge's decision to admit evidence "must stand unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide of the mark that a manifest denial of justice resulted." State v. Cole, 229 N.J. 430, 449 (2017) (quoting State v. Carter, 91 N.J. 86, 106 (1982)). However, we review questions of law de novo. State v. J.D., 211 N.J. 344, 354 (2012).

"Relevancy is the hallmark of admissibility of evidence." State v. Williams, 240 N.J. 225, 235 (2019) (quoting State v. Darby, 174 N.J. 509, 519 (2002)). "Relevant evidence is any 'evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action.'" Hrymoc v. Ethicon, Inc., 254 N.J. 446, 464 (2023) (quoting N.J.R.E. 401). "Pursuant to N.J.R.E. 402, all relevant evidence is admissible, except as otherwise provided by the Rules of Evidence or by law." Ibid.

"Under N.J.R.E. 403, relevant evidence may be excluded by the trial court if its probative value is substantially outweighed by the risk of undue prejudice, juror confusion, or undue delay." Ibid. "The mere possibility that evidence could be prejudicial does not justify its exclusion." State v. Brockington, 439 N.J. Super. 311, 333 (App. Div. 2015) (quoting State v. Long, 173 N.J. 138, 164

30

(2002)).  To exclude evidence under N.J.R.E. 403, its probative value must be "so significantly outweighed by its inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the issues in the case."  Wakefield, 190 N.J. at 429 (quoting State v. Koskovich, 168 N.J. 448, 486 (2001)).

## A.  Personal Items Found in Defendant's Vehicle

Defendant contends the judge erred in admitting personal items found in his car "that were highly prejudicial and entirely irrelevant to the offense."  The challenged items included: the flare gun found between defendant's legs upon his arrest; "shotgun shells, a speed loader, brass knuckles, knives, and 'assorted other items' in the trunk of his car;" and "a mask, security badge, gun holster, marijuana, and a firearm purchaser identification card" issued to another person.

Defense counsel argued these items "ha[d] no relevance" and were offered gratuitously to portray defendant as "a bad guy."  The judge overruled the objection, finding "the fatal shot was fired from the defendant's vehicle" and therefore "weapon related paraphernalia" found inside defendant's car was "relevant and material."

Defense counsel also argued the State engaged in "trial by character smearing," attempting to connect the irrelevant items from defendant's car "as

evidence of guilt of one shot from one gun by one person." The judge overruled this objection, concluding the weapons found in defendant's car were "highly relevant" and the marijuana "clearly [went] to the concept of mental capacity which defense counsel opened up."

We discern no error in the judge's admission of the personal items seized from defendant's car. The weapons and ammunition found in defendant's car supported defendant's asserted defenses. At trial, defendant argued the fatal gunshot could not have come from his car. Alternatively, he argued Fiore fired the fatal shot. Thus, weapons and ammunition found in defendant's car were clearly relevant and material to prove or disprove whether defendant shot Calhoun. Further, defendant's possession of multiple weapons in his car was probative of his mental state and whether he had a purpose to kill someone.

We also reject defendant's argument related to the judge's admission of the New Jersey FPIC as evidence. The card, issued in the name of another individual, was relevant to the counts charging defendant with illegal possession of firearms.

Additionally, we reject defendant's argument concerning admission of suspected marijuana found in his car. The suspected marijuana was relevant and

32

probative of defendant's mental capacity, which was a cornerstone of his defense.

On appeal, defendant advances no specific argument regarding the judge's the admission of the security badge or mask found in his car. An argument not briefed on appeal is deemed waived. N.J. Dep't of Env't Prot. v. Alloway Township, 438 N.J. Super. 501, 505 n.2 (App. Div. 2015); Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2025).

On this record, we are satisfied the judge did not abuse his discretion in admitting as evidence the personal items found in defendant's car. The items were relevant based on the theories of the case advanced by defendant and the State. In considering the theories of the case presented to the jury, the probative value of the items found in defendant's car outweighed any potential prejudice.

## B. Defendant's Use of Adderall and Marijuana

Defendant contends the State's focus on his drug use was impermissible under State v. Mazowski, 337 N.J. Super. 275 (App. Div. 2001). He asserts such comments were "inflammatory speculation based on the notion that drug abuse generally makes someone deranged to the point of murder." Defendant claims the prosecutor's "arguments were not reasonable inferences based on the evidence but rather complete inventions" because there was no expert testimony

33

presented to the jury suggesting Adderall and marijuana could not be taken at the same time.

In his summation, the prosecutor referred to defendant's Adderall and marijuana use three times. The first time, the prosecutor stated defendant "used marijuana daily and he ended up after the summer of 2017 using Adderall daily." The second time, the prosecutor stated defendant bought Adderall "on the street and he liked the impact and [e]ffect that it had on him," prompting defendant to visit Fiore's doctor to obtain a prescription for Adderall. The third time, the prosecutor told the jury defendant took "too many tablets at one time" and continued to drive. The prosecutor also commented on the number of pills left in the bottle of Adderall found in defendant's car compared to number of pills that should have been in the bottle if defendant took the dosage of Adderall as the doctor prescribed.

Specifically, the prosecutor told the jury:

> Now, there are days that from Nicole Fiore's testimony Adderall and marijuana together, marijuana every day, Adderall every day. Now, you heard no testimony, expert testimony with regard to Adderall. So, in this case, it's incumbent upon each one of you individually and collectively to talk about the impact of using that drug in a way not prescribed. . . .
>
> You know it was legally prescribed. You know that the defendant had a right to take it. But the question in this

34

case is did he abuse that right and what effect did it have on him in this case?

At the end of his summation, the prosecutor argued:

> In sum, ladies and gentlemen, I submit to you that this single shot, this solitary event in time fired from a handgun that he valued, aimed directly at a person he did not know fired at a family, [Michel], [the infant daughter] and . . . Sciasia Calhoun, that he never had the privilege of meeting because of the anger and paranoia that he, himself, nobody else, he, himself created day in and day out by the way he used the prescribed drugs[,] it was his choice. Nobody else's choice, his choice as to how to use and abuse those drugs. And combined with the conspiracy theories, leads up to this place in time.

The prosecutor made the foregoing remarks in response to defense counsel's closing argument which portrayed Fiore as a violent drug addict who fired the fatal shot on May 3, 2018.

In reviewing the summations, only defense counsel argued Fiore was a drug addict. At no time during the trial, including summation, did the prosecutor refer to defendant as a drug addict.

Further, evidence of defendant's use of Adderall and marijuana supported defense counsel's request that the judge issue a voluntary intoxication instruction to the jury. While the jury rejected defendant's voluntary

intoxication defense, this result did not deprive defendant of his right to a fair trial.

Moreover, defendant's reliance on <u>Mazowski</u> is misplaced. 337 N.J. Super. at 287. In this case, unlike the State's evidence in <u>Mazowski</u>, the prosecutor described defendant's abuse of a legally prescribed drug based on the facts adduced at trial. Further, the evidence in <u>Mazowski</u> was "scant" and primarily used to establish the defendant's motive. <u>Ibid.</u> Here, the prosecutor's comments regarding defendant's Adderall and marijuana use were fair comments based on the substantial trial evidence.

## C. Defendant's Secretive Nature

Defendant argues the prosecutor improperly impugned his character by referring to him as "secretive." The prosecutor argued to the jury that "defendant didn't want to let anyone who was a part of his life or even tangentially in his life, to know about his unhappy circumstances at the time, unemployed and homeless. Well, secretive." The prosecutor further told the jury that defendant's vehicle contained a firearm "carefully placed in a secretive location under the trunk liner wrapped in his t-shirt."

The prosecution "may not offer evidence of the defendant's character to support an inference about the defendant's conduct on a specific occasion unless

the defendant has first produced evidence of good character." State v. Hunt, 115 N.J. 330, 369 (1989) (citing N.J.R.E. 404(a)). While such comments are "ill-advised," they do not necessarily result in prejudice to a defendant. Id. at 372. If "arguments are based on the facts of the case and reasonable inferences therefrom, what is said in discussing them, by way of comment, denunciation or appeal will afford no ground for reversal." State v. Mahoney, 188 N.J. 359, 376 (2006) (quoting Smith, 167 N.J. at 178).

Here, the prosecutor's comments about defendant's "secretive" conduct were inferences based on the trial evidence. The State proffered the following testimony in support of defendant's secretive nature: defendant's repeated insistence Fiore disassemble her cell phone and change her number to avoid being tracked by "gang stalkers" and defendant's concealment of a firearm wrapped inside a shirt and then tucked in a compartment within the Impala's trunk. On these facts, we are satisfied the judge did not err in permitting the prosecutor's comments related to defendant's secretive nature.

### D. Defendant's Poverty and Homelessness

Defendant argues the State elicited irrelevant and prejudicial trial testimony regarding his homelessness and made "denigrating comments about his homelessness and poverty" in summation. At trial, the State proffered

testimony defendant was "homeless," lived "out of his car," exercised in the park, "had trouble finding work and maintaining a job," and often drove "around aimlessly." Based on these statements, defendant claims the prosecutor improperly portrayed "him as a disturbed person more likely to commit the shooting because he was homeless and living in poverty."

Because defense counsel did not object to these comments at trial, we review for plain error. R. 2:10-2. We first determine whether there was misconduct on the part of the prosecutor. See Frost, 158 N.J. at 83. Even if misconduct occurred because of the prosecutor's statements, we would not reverse unless the conduct was so egregious it deprived defendant of a fair trial. State v. DiFrisco, 137 N.J. 434, 474 (1994).

Regarding admission of poverty evidence, "there must be something more than poverty to tie a defendant into a criminal milieu." State v. Mathis, 47 N.J. 455, 472 (1966). Trial courts should not admit evidence of poverty "to prove motive or willingness to commit a crime." State v. Copeland, 94 N.J. Super. 196, 202 (App. Div. 1967); see also State v. Stewart, 162 N.J. Super. 96, 100 (App. Div. 1978) ("[I]t is generally improper to use a defendant's poverty to establish a criminal motive").

At no time did the prosecutor elicit testimony suggesting defendant shot and killed Calhoun because he was poor and lived out of his car. Not a single witness testified defendant's lack of a job or permanent residence motivated him to shoot Calhoun. Nor did the prosecutor argue defendant's poverty rendered him more likely to engage in criminal activity. The fact that defendant was unemployed and lived in his car was offered by the State as evidence the crime was committed while defendant drove around in his car, not that his actions were motivated by any financial need.

On this record, we discern no abuse of discretion in allowing the State's fleeting references to defendant's homelessness and poverty that deprived defendant of a fair trial.

### E. Defendant's Jailhouse Call to Fiore

Defendant contends the judge erred in admitting an unredacted recording of his jailhouse call to Fiore. He asserts the conversation contained irrelevant, denigrating, and severely prejudicial statements by Fiore, pointing to Fiore accusing defendant of "affairs" and visiting "sex stores." He further notes Fiore called him a liar during that conversation, which infringed on the jury's role in determining credibility.

A-1038-22

The entirety of the jailhouse call was played for the jury. At the beginning of the call, defendant claimed there "was a second shot fired" and insisted his shot did not strike Calhoun. However, later in the conversation, defendant stated the shooting "was an accident" and he fired "to scare" the occupants of the Mazda. It was when defendant suggested Fiore marry him that she accused him of "lying" and cheating on her.

Defendant moved for a mistrial after the State played the complete recording for the jury. He asserted the judge should have considered his application to redact portions of the jailhouse recording, arguing "the tape [was] pregnant with material that [was] totally prejudicial." The judge denied the motion, in part, because defendant made the application on the morning the State intended to play the recording for the jury. The judge found the jailhouse conversation "was known to the defense for quite some time" but defendant never raised possible redactions until the morning the State intended to play the call for the jury. Even presuming the redactions could have been accomplished on short notice, the judge concluded redacting "all of those personal gripes" between defendant and Fiore would have "destroyed the flavor of the conversation." Moreover, the judge found "nothing illegal or criminal [was] alleged in any of the references made in the [jailhouse] conversation." The judge

further concluded there was nothing "unduly prejudicial in any of the extraneous comments" cited by defense counsel in his application for a mistrial based on the unredacted jailhouse telephone call.

In the jailhouse recording, defendant and Fiore engaged in a heated argument. During the argument, defendant repeatedly denied having affairs with other women and changed his story about Calhoun's shooting. In an outburst of apparent frustration and anger during the conversation, Fiore called defendant a "liar." Because Fiore testified at trial and defense counsel moved for a mistrial prior to cross-examining Fiore, defendant had the opportunity to explore why she called defendant a liar during this conversation if he chose to do so.

On this record, we discern no abuse of discretion in the judge's admission of the unredacted jailhouse call. The redactions requested by defendant would have altered the context of the conversation for the jury's consideration. By reviewing the entire jailhouse telephone call, the jury had the ability to determine the import of the conversation between defendant and Fiore despite its meandering nature.

41

## IV.

We next consider defendant's argument that the judge erred in permitting the prosecutor to present "a hypothetical wherein someone hits and kills another while driving under the influence [(DUI)]." Defense counsel objected to the State comparing reckless manslaughter to DUI.

In his summation, the prosecutor noted defendant was charged with aggravated manslaughter and reckless manslaughter as lesser included offenses of purposeful murder. The prosecutor told the jury:

> I suggest to you that this is a pertinent example of manslaughter. That the defendant was driving his 2005 white Chevy Impala under the influence of too much Adderall, drove through a red light and collided with another car, killing the driver. That's reckless. Under the influence of a substance, he got behind the wheel of a car and then didn't properly drive, didn't obey the traffic laws and killed someone. Did he start out with a purpose to do that? Was that his intent at the time that the collision happened? No. No, it wasn't.
>
> That's an example of reckless manslaughter. That's not this case. Under any circumstances that's not this case. He didn't consciously disregard anything. He consciously decided, not disregarded, he consciously decided that he was going to shoot the person who had the temerity to flash their brights in his rearview mirror. That's what he planned on doing. That's what he wanted to do. That's what he did.

42

Defense counsel objected after the prosecutor completed his summation. The judge overruled the objection, stating "whether it was artful or inartful," there was nothing "inappropriate about" the hypothetical "requiring a mistrial or any kind of a curative instruction."

We consider the prosecutor's summation in the context of the entire trial. Morton, 155 N.J. at 419. In his summation, defense counsel argued there were "no if's and's or but's" about this case being "obviously reckless." Based on the evidence, the prosecutor argued in summation that defendant's actions could not have been reckless because he consciously intended to shoot at Calhoun's car and admitted to doing so in the recorded jailhouse call to Fiore. The prosecutor's hypothetical to the jury was designed to explain why defendant's actions were not reckless as argued by defense counsel.

While the prosecutor's hypothetical may have been "inartful," it was not so egregious as to deprive defendant of a fair trial, warranting reversal of his convictions. The judge properly instructed the jury on the law governing manslaughter, which the jury is presumed to have followed. State v. Feaster, 156 N.J. 1, 65 (1998). There was sufficient evidence proffered at trial to support a finding of reckless manslaughter had the jury been so inclined.

A-1038-22

V.

We next consider defendant's argument the judge erred by instructing the jury under the incorrect subsection of the statute governing second-degree possession of a firearm. According to the indictment and judgment of conviction, defendant was charged under N.J.S.A. 2C:39-5(b). However, the judge instructed the jury under N.J.S.A. 2C:39-5(d). As a result, defendant contends the "jury was instructed on a completely different offense" than the offense charged under the indictment.

The State acknowledged the judge gave the jury an incorrect instruction. However, it claims the error was harmless because the judge "fully defined a firearm" and the relevant mental state for a conviction on defendant's possession of a firearm. The State further argues the error was harmless because the "parties stipulated to the fact that defendant did not have a permit." We disagree with the State's argument.

"Appropriate and proper charges to a jury are essential for a fair trial. State v. Lora, 465 N.J. Super. 477, 501 (App. Div. 2020) "Jury charges must provide a 'comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may

find.'" State v. Singleton, 211 N.J. 157, 181-82 (2012) (quoting State v. Green, 86 N.J. 281, 287-88 (1981)).

When there is no objection, we review for plain error and "disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting R. 2:10-2). Plain error in a jury charge is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant [and] sufficiently grievous to justify notice by the reviewing court and to convince the court that . . . the error possessed a clear capacity to bring about an unjust result." Camacho, 218 N.J. at 554 (first alteration in the original) (quoting State v. Adams, 194 N.J. 186, 207 (2008)).

"[B]ecause clear and correct jury instruction are fundamental to a fair trial, erroneous instructions in a criminal case are 'poor candidates for rehabilitation under the plain error theory.'" Adams, 194 N.J. at 207 (quoting State v. Jordan, 147 N.J. 409, 422 (1997)). Our Supreme Court has "consistently held that incorrect charges on substantive elements of a crime constitute reversible error." State v. Rhett, 127 N.J. 3, 7 (1992); see also State v. Grunow, 102 N.J. 133, 148 (1986) ("We have always placed an extraordinarily high value on the importance of appropriate and proper jury charges to the right to trial by jury. Erroneous

A-1038-22

instructions on matters or issues material to the jurors' deliberations are presumed to be reversible error."). When a judge fails "to charge the jury on an element of an offense," the presumption of "prejudicial error" arises "even in the absence of a request by defense counsel." State v. Hodde, 181 N.J. 375, 384 (2004) (quoting State v. Federico, 103 N.J. 169, 176 (1986)).

Here, the indictment charged defendant with two counts of second-degree unlawful possession of a weapon without a permit (counts three and four) under N.J.S.A. 2C:49-5(b). In charging the jury, the judge stated:

> Counts three and four of the indictment each charge the defendant . . . with the crime of the knowing unlawful possession of a weapon. The statute on which this count of the indictment is based reads in pertinent part[:]
>
> Any person who knowingly has in his possession any other weapon under circumstances not manifestly appropriate for such lawful uses as it may have is guilty of a crime. In order to convict the defendant of this crime, the State must prove the following elements beyond a reasonable doubt. That S-9 and/or S-10 is a weapon that the defendant possessed . . . knowingly and that the defendant's possession of the weapon was under circumstances not manifestly appropriate for unlawful use.

The foregoing jury instruction by the judge tracked the model jury charge for N.J.S.A. 2C:39-5(d). The charge under subsection (d) of the statute reads:

the State must prove the following elements beyond a reasonable doubt:

> 1. That S-_____ is a weapon (or that there was a weapon);
>
> 2. That the defendant possessed the weapon knowingly; and
>
> 3. That the defendant's possession of the weapon was under circumstances not manifestly appropriate for a lawful use.
>
> [Model Jury Charges (Criminal), "Unlawful Possession of a Weapon" N.J.S.A. 2C:39-5(d) (rev. Nov. 13, 2023).]

However, the State charged defendant under N.J.S.A. 2C:39-5(b), not

N.J.S.A. 2C:39-5(d). Subsection (b) of the statute reads:

> the State must prove each of the following elements beyond a reasonable doubt:
>
> 1. S-___ is a handgun (CHARGE IF APPROPRIATE: That there was a handgun);
>
> 2. That the defendant knowingly possessed the handgun; and
>
> 3. That the defendant did not have a permit to possess such a weapon.
>
> [Model Jury Charges (Criminal), "Unlawful Possession of a Handgun (Second Degree) (N.J.S.A. 2C:39-5(b)) (rev. June 11, 2018) (emphasis omitted).]

47

The State must prove different elements for subsection (b) and subsection (d). N.J.S.A. 2C:39-5(d) requires the State prove "the defendant's possession of the weapon was under circumstances not manifestly appropriate for a lawful use." Model Jury Charges (Criminal), "Unlawful Possession of a Weapon" (N.J.S.A. 2C:39-5(d)) (rev. Nov. 13, 2023). N.J.S.A. 2C:39-5(b) requires the State prove "the defendant did not have a permit to possess" a handgun. Model Jury Charges (Criminal), "Unlawful Possession of a Handgun (Second Degree) (N.J.S.A. 2C:39-5(b)) (rev. June 11, 2018).

Additionally, subsection (d) of the statute requires the exhibit proffered by the State be a weapon. Subsection (b) requires the exhibit proffered by the State be a handgun. A weapon is "anything readily capable of lethal use or of inflicting serious bodily injury." Model Jury Charges (Criminal), "Unlawful Possession of a Weapon" (N.J.S.A. 2C:39-5(d)) (rev. Nov. 13, 2023). A handgun is any "firearm originally designed or manufactured to fire or eject any solid projectile." Model Jury Charges (Criminal), "Unlawful Possession of a Handgun" (Second Degree) (N.J.S.A. 2C:39-5(d)) (rev. June 11, 2018).

A defendant may be convicted under N.J.S.A. 2C:39-5(d) regardless of whether he or she had a permit. Here, by instructing the jury under N.J.S.A. 2C:39-5(d), the jurors may not have decided whether defendant had a permit to

possess the handgun, which is a critical element of the crime under N.J.S.A. 2C:39-5(b).

We reject the State's argument that the stipulation presented to the jury regarding defendant's lack of a permit to possess a gun cured the error in the jury instruction. Counsels' stipulation was not binding on the jury because, "as with all evidence, undisputed facts can be accepted or rejected by the jury in reaching a verdict." State v. Wesner, 372 N.J. Super. 489, 495 (App. Div. 2004). To convict defendant under N.J.S.A. 2C:39-5(b), the jury was required to find defendant lacked a permit. Because the judge did not instruct that the jury had to find defendant lacked a permit, the error warrants reversal of defendant's convictions on counts three and four charging possession under N.J.S.A. 2C:39-5(b).

## VI.

In light of our decision to vacate defendant's convictions on count three and four of the indictment and remand for a new trial limited to the second-degree firearm possession charges asserted in those counts, we need not address defendant's sentencing arguments. The judge shall conduct a new sentencing hearing after the retrial limited to counts three and four of the indictment.

49

To the extent not addressed, defendant's remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed in part. Vacated and remanded in part for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1038-22